UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETE J. MANGER,<br><br>    Plaintiff,<br><br>    v.<br><br>LEAPFROG ENTERPRISES, INC., et al.,<br><br>    Defendants. | Case No. 16-cv-01161-WHO<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: Dkt. No. 45 |

In this shareholder derivative lawsuit, plaintiff Pete Manger alleges that defendant Leapfrog Enterprises, Inc. (LeapFrog) and seven of its former Board of Directors members violated the Securities and Exchange Act of 1934 by issuing a false and misleading Recommendation Statement that recommended that shareholders of LeapFrog tender their shares pursuant to a Tender Offer from VTech. On a prior motion to dismiss, I found that Manger failed to state a claim under Section 14(e) of the Exchange Act because he failed to allege with the required specificity which statements in the Recommendation Statement were false or misleading and why, failed to allege facts showing scienter, and failed to allege facts showing loss causation. I dismissed that claim, along with the pendent Section 20(a) claim, with leave to amend.[1]

Manger filed his Second Amended Complaint ("SAC"), attempting to fix the problems I identified. He did not. For the reasons discussed below, I GRANT defendants' motion and dismiss Manger's SAC without leave to amend.

**BACKGROUND**

In February 2016, LeapFrog, VTech, and VTech's wholly owned subsidiary Bonita Merger Sub, LLC entered into an agreement and plan of merger (Merger Agreement). Pursuant to

---

[1] I also dismissed without leave to amend Manger's purported Section 14(d)(4) claim.

the terms of the Merger Agreement, VTech made a Tender Offer on March 3, 2016 (expiring April 1, 2016), whereby each LeapFrog share would be cashed out for $1.00. Second Amended Complaint (SAC) ¶ 8.

On March 3, 2016, LeapFrog filed a Schedule 14D-9 Solicitation/Recommendation Statement with the Securities and Exchange Commission and disseminated it to its shareholders. The Recommendation Statement recommended that shareholders agree to the $1.00 a share Tender Offer. In his SAC, Manger identifies the following false or misleading statements from the Recommendation Statement:

- The deterioration in the Company's business, the major declines in revenues in the past three fiscal years, the *timing for its prospects for future growth, including substantial continuing declines anticipated in the children's Tablet business* that *provided significant revenue and contributed to operating profits and cash flow* in prior periods, and the general risks associated with Company's ability to execute on a business plan that would create stockholder value in excess of the consideration offered in the Merger;

- *The significant possibility that the Company would not have sufficient liquidity available from its cash balances and available credit facility to continue its operations during the first and second quarter of the 2017 fiscal year, leading to the Company's expression of significant and credible doubt that it will be able to continue operations as a going concern*;

- The performance of LeapTV, a major new product launch, which required significant costs to develop, and which has fallen significantly short of sales goals. *This resulted in a significant reduction to available liquidity* and in high costs to assist retailers to reduce their excess inventories and to clear out LeapTV inventories across the Company's supply chain;

- The need to develop new products to remain competitive and relevant to maintaining existing and obtaining prospective customers, the substantial required investment and long lead times associated with new products, and the risk that the Company could make substantial investments in products for markets that do not develop as, or develop more slowly than, the Company may have originally anticipated.

SAC ¶ 10 (citing Recommendation Statement, p. 22) (emphasis in SAC).

According to Manger, these "critical" statements went to the core of the business being able to operate as an ongoing concern and were false and/or misleading because they conveyed a more dire financial situation than actually existed. SAC ¶ 11. Defendants relied on these

2

assertions of financial straits and the liquidity problem to push the Tender Offer and justify their position that there was no time to consider offers other than VTech's. *Id*. ¶ 12. Manger asserts that the March 2016 representations of a liquidity problem were false because, as of a November 9, 2015 earnings call, LeapFrog had no debt obligations and had access to a $75 million revolving credit facility to fund working capital through the fourth quarter, when cash flow was expected to turn positive again. *Id*. ¶ 13. In that same call, defendant John Barbour (the former CEO) noted LeapFrog's gain in market share in the children's tablet segment, due primarily to the new "EPIC" tablet that had not yet been fully rolled out. *Id*. ¶ 14. Two confidential witnesses (CW1, a former LeapFrog senior allocations analyst who was employed through September 2016, and CW2 a former manager of sales analytics through May 2016) confirmed that the early roll out of the EPIC tablet was a success and that at company-wide meetings in March 2016 – prior to the close of the Tender Offer – unnamed senior executives reported that LeapFrog was in a "good position" with $40 million in cash, and that with the credit facility the company could have continued as a stand-alone company for at least another year. *Id*. ¶¶ 15-16; *see also id*. ¶¶ 57-58. LeapFrog also acknowledged the success of the EPIC tablet during the negotiations of the merger and Tender Offer, even commencing a trademark infringement action in July 2016 in order to protect the valuable intellectual property rights LeapFrog had in EPIC. *Id*. ¶ 17.

After conducting its own investigation, the United Kingdom's Competition and Markets Authority ("CMA") concluded that there "would have been alternative purchasers for LeapFrog had the VTech Transaction not proceeded" and LeapFrog had sufficient liquidity for operations through June/July 2016. *Id*. ¶ 18; *see also id*. ¶¶ 65-67. Finally, Manger notes that in 2015 defendant Barbour announced a number of "cost cutting" efforts and a "major strategic review" in order to guide the company's future, which in part led to the launch of EPIC. *Id*. ¶¶ 5, 48.

By ignoring these "positives," Manger argues, the Recommendation Statement statements were false or misleading because defendants failed to include: (i) the information about cash and the credit facility; (ii) the remarkable success of the EPIC tablet; (iii) the possibility of other potential buyers; and (iv) any actual internal financial measures. Instead, the Statement repeatedly emphasized the failure of the LeapTV product as the source of its declining revenues and liquidity

3

problems. *Id*. ¶¶ 19, 21.

According to Manger, in their rush to push through the VTech Tender Offer the defendants also failed to have their financial advisor Morgan Stanley & Co LLC (who rendered the fairness opinion) run "critical" but unnamed financial valuations "typically" performed in these circumstances. *Id.* Instead, Morgan Stanley performed a liquidation analysis that it was not qualified to do on which the Board relied on in recommending the Tender Offer. *Id*. ¶ 20. Defendants also discouraged other bidders by providing VTech with "unreasonable deal-protection" devices, including preventing Board members from soliciting other bids, requiring information about other bids to be provided to VTech, giving VTech five days to make a competing offer, and imposing a $2.9 million termination fee. *Id*. ¶ 26.

Manger alleges that despite the potential for future growth – presumably from EPIC and the other unspecified measures resulting from the strategic review – and the alleged ability to fund operations for another year, defendants agreed to the inadequate merger considerations and rejected and/or shut down the bidding process with other companies. *Id*. ¶ 24. Defendants did so, according to Manger, in order to reap the benefits from "accelerated vesting" of stock options and payments under the employee stock purchase plan and thereby benefitted by giving themselves "liquidity" that they otherwise would not have had. *Id*. ¶¶ 24-25.

In early April 2016, 56% of outstanding shares were tendered, just enough to effectuate the merger. All LeapFrog shareholders were cashed out of their shares at $1.00 per share. SAC ¶ 8.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id*. While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts

4

sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether a plaintiff has stated a claim upon which relief can be granted, the Court accepts plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). Moreover, in this case, with omissions-based claims asserted under Section 14(e) of the Exchange Act, the heightened pleading requirement of Rule 9(b) applies. *See, e.g., Deutsch v. Flannery*, 823 F.2d 1361, 1362 (9th Cir. 1987) (applying Rule 9(b) to 14(e) claim that tender offer solicitation "failed to disclose" material information).

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir.1989).

**DISCUSSION**

Section 14(e) of the Exchange Act prohibits a person from making "any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation." 15 U.S.C. § 78n. In addition to meeting the Rule 9(b) heightened pleadings requirements, under the PSLRA Manger must plead particular facts showing falsity and scienter. *See, e.g., Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1167 (9th Cir. 2009) ("the analysis of Rubke's section 14(e) claims is identical to that of her section 10(b) claims with regard to falsity").

## I. FALSITY

As I noted in my prior Order, there were two problems with Manger's prior Amended Complaint:

> First, Manger does not identify with specificity the statements in the Recommendation that were rendered misleading by the failure to include information regarding the EPIC tablet. At most, in his opposition, he refers to paragraphs 92 and 97 of his Amended Complaint where five general statements are identified, but there is no "connection" showing how each of those statements was made misleading by the failure to disclose the EPIC results. Second, Manger fails to allege facts supporting his assertion that the allegedly omitted information regarding the EPIC tablet could have undermined any of those statements: e.g., facts that the success of EPIC in the 2015 holiday season meant that the company was not in dire financial straits, or was not facing severe underperformance based on its operating plan, or was not facing a severe liquidity situation.

January 23, 2017 Order at 6.

Manger contends he has cured these defects by alleging additional facts and linking those facts to the allegedly misleading Recommendation statements. In the SAC, Manger repeats his initial claim that the "doom and gloom" characterization of LeapFrog's financial condition as portrayed in the Recommendation Statement was false or misleading because of the success of the EPIC tablet, which was not mentioned in the Statement. But the focus of the SAC has shifted; Manger now argues that the Recommendation statements regarding an impending liquidity crisis were false and/or misleading in light of: (i) public statements made in November 2015 regarding cash and the credit facility; (ii) public statements in January 2016 that LeapFrog paid off the $20 million it owed to the credit facility; and (iii) conclusions reached by the UK's CMA that the liquidity crisis wouldn't hit until June 2016, giving LeapFrog more time (presumably) to seek other offers.

Manger also attempts to plead falsity by relying on certain allegations that were attacked by defendants on the last round of briefing, but not discussed in Manger's opposition. Defendants argue that Manger cannot now rely on those "waived" claims.

### A. Omission of EPIC Information/Focus on LeapTV

In the SAC, Manger adds some additional facts regarding the EPIC tablet's initial success and its continued success after the Merger was consummated. *See* SAC ¶¶ 14, 15, 17, 56-58. Manger relies on these facts to argue, again, that the failure to disclose how well EPIC was doing

6

in the Recommendation Statement and instead disclosing only how the poor performance of LeapTV impacted the company "misled stockholders about the company's future prospects." Oppo. at 6-7.

Manger points to the following statements in the Recommendation that he claims were false or misleading:

> The deterioration in the Company's business, the *major* declines in revenues in the past three fiscal years, the *timing for its prospects for future growth, including substantial continuing declines anticipated in the children's Tablet business* that *provided significant revenue and contributed to operating profits and cash flow* in prior periods, and the general risks associated with Company's ability to execute on a business plan that would create stockholder value in excess of the consideration offered in the Merger
> …
> The performance of LeapTV, a major new product launch, which required significant costs to develop, and which has fallen significantly short of sales goals. *This resulted in a significant reduction to available liquidity* and in high costs to assist retailers to reduce their excess inventories and to clear out LeapTV inventories across the Company's supply chain;

Oppo. at 6-7 (citing FAC ¶ 118, emphasis in original).

Manger's new facts do not, however, get him to where he needs to be. As I noted in the prior Order, Manger needed to allege facts showing that the omission of the EPIC information from the Recommendation Statement is contrary to the information contained in the Recommendation or makes that information misleading. Manger does not dispute that defendants had disclosed the positive EPIC information, both in the earnings calls relied on by Manger and in other SEC filings. More significantly, there are no *facts* alleged that the EPIC success *meant* that the "declines anticipated in the children's Tablet business that provided significant revenue and contributed to operating profits and cash flow" were not a problem or as big of a problem as the Recommendation conveyed. There are similarly no *facts* alleged that LeapTV *did not* result in a significant reduction in liquidity or that that reduction was offset by EPIC such that the Recommendation Statement was false or misleading.

Seeking to put a gloss on his prior allegations, Manger narrows his focus and argues that EPIC's success meant not that the company was on a stronger financial footing for the long term but, instead, that the company should have been able to continue in operations "at least for enough

7

time to consider alternate strategic offers." Oppo. 7. This short term stability was demonstrated, according to Manger, by the following facts that were not included in the Recommendation Statement: (i) LeapFrog's market share in the children's Tablet market was increasing at a remarkable rate (even if overall market share for all competitors was falling); (ii) EPIC tablet sales represented 14% and 10% of sales during the three and nine months ending December 31, 2015; (iii) the EPIC tablet was a core component of LeapFrog's Tablet strategy; (iv) retailers were working to increase their holiday forecasts for the EPIC tablet; (v) Amazon and Wal-Mart especially did well with EPIC tablets; (vi) the demand for EPIC tablets actually exceeded forecasts, SAC ¶¶ 54, 58, 122; (vii) the Company valued its EPIC trademark so much it initiated an infringement lawsuit, SAC ¶ 17; and (viii) VTech revised the EPIC tablet forecast upward after the Merger was consummated. SAC ¶ 57; *see also* Opp. 7-8. These facts – some of which are recycled from the AC and the others either pre-date or post-date the time merger negotiations were ongoing and the Recommendation Statement was issued – do not fill in the gaps I identified in my prior Order. Even with Manger's revised, narrower focus, there are no facts alleged showing that EPIC's success was so great and could contribute to operating profits such that the company was not in as dire a financial situation as the Recommendation Statement portrayed it or that EPIC's success *meant* LeapFrog had the financial breathing room to either reject VTech's offer and continue to court or pursue other offers.[2]

**B.  Liquidity**

In addition to the narrowed focus as to the consequences of the misleading Recommendation Statement (that in reality LeapFrog had more financial stability and time to pursue offers other than the VTech's), Manger has also shifted his focus on what was false or

---

[2] Combined into this argument is a reiteration of Manger's prior position that the Recommendation Statement's failure to disclose LeapFrog's actual projected financial data including "the inputs for Morgan Stanley's work" meant that the bases for LeapFrog's recommendations based on poor projected revenue, operating profits, and cash flow were too conclusory. Oppo. 8-9. I have already rejected Manger's argument that simply because LeapFrog appropriately included in its Recommendation Statement a recitation of its dim financial prospects, LeapFrog was somehow then required to disclose in more detail the forecasted dismal financial data. January 23, 2017 Order at 6-7. The cases Manger relies on do not support that argument.

8

misleading in the Recommendation Statement to emphasize misstatements or misleading statements regarding the company's liquidity. In particular, he identifies the following:

- *The significant possibility that the Company would not have sufficient liquidity available from its cash balances and available credit facility to continue its operations during the first and second quarter of the 2017 fiscal year, leading to the Company's expression of significant and credible doubt that it will be able to continue operations as a going concern*;

- The performance of LeapTV, a major new product launch, which required significant costs to develop, and which has fallen significantly short of sales goals. *This resulted in a significant reduction to available liquidity* and in high costs to assist retailers to reduce their excess inventories and to clear out LeapTV inventories across the Company's supply chain;

- The expiration of the Company's current credit facility in March 2017 and the probability that the Company would be unable to renew or replace the facility in light of its recent financial performance.

SAC ¶ 118 (emphasis in SAC, citing Recommendation Statement at 22). Manger contends that these liquidity representations – the significant possibility of running out of cash "as early as" the first fiscal quarter 2017 (*i.e.*, April 2016)[3] – are false or misleading because LeapFrog had some amount of cash on hand and LeapFrog's credit facility would provide liquidity through June/July 2016, so there was no "risk" of running out of cash as early as April 2016. Oppo. 10-11. The June/July 2016 timeframe would, according to Manger, have allowed LeapFrog to continue to investigate better deals than the VTech Tender Offer, including the $1.10 offer from L&M that came in on March 22, 2016. SAC ¶ 97.

However, as defendants point out, the Recommendation Statement says that there is a "significant possibility" that LeapFrog would not be able to continue its operations *during* the first *and* second quarter. April is simply the beginning of the first quarter, ending June 30th with the second quarter starting July 1st – the exact time when Manger himself alleges the liquidity crisis would have hit. SAC ¶¶ 65-67 (relying on the conclusions of the UK CMA Report).

---

[3] LeapFrog's fiscal year ran from April 1 through March 31st. *See, e.g.,* Foster Decl., Ex. C, (LeapFrog 10K for Fiscal Year 2015).

Manger also considers "misleading" the Recommendation Statement's silence whether the Bank of America would have extended the credit facility. Oppo. 11; SAC ¶¶ 61, 66. But the document relied on by Manger to substantiate his allegation that LeapFrog would not have run out of cash or credit until June 2016 notes that there is no evidence that BofA would have extended more credit and that it was likely LeapFrog would have defaulted on its covenants by June 2016. CMA Report §§ 5.10, 5.17. In sum, everyone is in agreement that by June 2016 LeapFrog's liquidity would have run out.

Manger has not identified anything potentially false or misleading in the Recommendation Statement regarding the liquidity statements. Manger's real complaint – in essence – is that the Board was wrong to push the VTech Tender Offer after the L&M offer came in, and the Board should have put the brakes on VTech and at least pursued the L&M offer. Oppo. 11. But this case is not about the Board making wrong or imprudent business decisions. Manger's case is about a false or misleading Recommendation Statement. That the Board made bad decisions either prior to or after the Statement was released does not mean the Recommendation Statement was false or misleading.

### C. Arguments Not Addressed on Prior Motion

In the prior round of briefing on defendants' motion to dismiss Manger's Amended Complaint, defendants attacked but Manger did not address (and therefore arguably waived reliance on) the following allegations of falsity: (i) that the Recommendation Statement did not disclose Morgan Stanley's conflict of interest, namely its $4 million fee was contingent on closing a transaction; and (ii) that LeapFrog had valuable intellectual property rights that mitigated its dire financial circumstances.

Even if each of these arguments were not waived by Manger's failure to defend them in the prior round of briefing and argument, they do not in and of themselves establish falsity. Concerning Morgan Stanley's fee, the Recommendation Statement identified that:

> LeapFrog has agreed to pay Morgan Stanley a fee of approximately $4 million in the aggregate, a portion of which was paid as retainers, a portion of which was payable upon the rendering of its opinion and a portion of which is contingent upon the consummation of the Transaction

Recommendation Statement at 28. The Statement also disclosed that a "substantial portion" of that fee was contingent upon the closing of the transaction. *Id.* at A-2.

Manger argues that the Statement should have disclosed exactly what portion of the $4 million fee was contingent because otherwise stockholders would not be able to assess Morgan Stanley's incentives and potential bias in recommending acceptance of the Tender Offer. Oppo. 12. That failure, according to Manger, is even more serious here in light of the fact that the company's financial forecasts reviewed by Morgan Stanley were not disclosed and Morgan Stanley, in agreement with the Board, did not perform the main valuation methodologies traditionally performed for the type of transaction at issue. SAC ¶¶ 130-132.

However, the disclosure that a "significant portion" of the $4 million fee was contingent is sufficient to allow shareholders to evaluate the role the fee might have played in Morgan Stanley's valuations and recommendation. *See, e.g., Cty. of York Employees Ret. Plan v. Merrill Lynch & Co.*, No. CIV.A. 4066-VCN, 2008 WL 4824053, at *11 (Del. Ch. Oct. 28, 2008) (the fact that the financial advisor would receive a fee, "a substantial portion of which is contingent upon the merger being consummated," was a sufficient disclosure). [4]

Regarding the intellectual property rights, Manger argues that the following statements were false or misleading, specifically that: (i) a liquidation of assets would not yield a per share value even close to the VTech offer of $1.00. (SAC ¶ 20), and (ii) on June 29, 2015, Morgan Stanley recommended that Leapfrog explore other alternatives in the event that a sale did not successfully occur, including opportunities to "divest or license certain assets." SAC ¶ 144. Those

---

[4] Manger's cases do not establish that the specific amount of fees that are contingent must be disclosed in a Recommendation Statement. Instead they stand for the proposition that the contingency nature of a fee or part of a fee should be disclosed, which is what happened here. *See Louisiana Mun. Police Employees' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1191 (Del. Ch. 2007) ("It follows then that where a significant portion of bankers' fees rests upon initial approval of a particular transaction, that condition must be specifically disclosed to the shareholder."); *In re Chicago & N. W. Transp. Co. Shareholders Litig.*, No. 14109, 1995 WL 389627, at *4 (Del. Ch. June 26, 1995) (concluding disclosure of contingency nature of banker's fee could be material to stockholders). Also, in *In re TIBCO Software Inc.Stockholders Litig.*, No. CV 10319-CB, 2015 WL 6155894, at *26 (Del. Ch. Oct. 20, 2015), the court addressed a different question and concluded that the contingent nature of a banker's fee could demonstrate a banker's motive to aid and abet an officer in a breach of fiduciary duty. That case is inapposite.

11

statements were made misleading, according to Manger, because defendants did not in the Recommendation Statement disclose the "very assets" that would have produced the greatest value in a liquidation or asset sale. Oppo. 13. But Manger cites no facts that would undermine or make misleading the Statement's valuation of LeapFrog's intellectual property and no case law that they were required to disclose the property that was valued.

Manger has not adequately alleged facts supporting falsity, despite having had three chances to do so. Defendants' motion to dismiss is GRANTED and Manger's claims are dismissed WITH PREJUDICE.

## II.  SCIENTER

Although I do not need to reach this issue, Manger argues that he cured his prior failure to adequately allege facts that are so "critically adverse" or "dramatically false" to the representations made that scienter can be inferred. He relies on what he calls the "corporate scienter doctrine" – which defendants contend is more appropriately called the "core operations doctrine" – that allows a plaintiff to combine allegations of falsity with specific allegations regarding management's role that suggest the defendants at issue had access to the "true" information. The doctrine also covers situations where the reportedly false information is "so obviously false," it would be absurd to suggest that top management were not aware of its falsity. Opp. 15-16 (relying on *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009), *as amended* (Feb. 10, 2009)).

In order to invoke this doctrine, Manger relies on the same allegations of falsity discussed above--the Recommendation Statement's failure to disclose information about and mischaracterization of its future prospects given EPIC and the misrepresentation of the liquidity situation. He then points to the following: (i) CFO Arthur was optimistic about the company's financials in the November 2015 earnings call; (ii) CEO Barbour (according to CW1) was fully aware of the success of EPIC and its prospects; and (iii) EPIC was successful, as evidenced in part by increased orders from Walmart following the merger.

The success of EPIC was never in dispute. What has been in dispute and missing from the beginning are facts that the success of EPIC meant that the statements made in the

12

Recommendation Statement were false or misleading. Moreover, that the company was in a certain position and expressed optimism in November 2015, at the cusp of its major sales season, does not provide much if any relevance to the company's status in March 2016 when the Recommendation Statement was published. The CW1 does not say, or provide facts establishing, that the information conveyed in the Recommendation Statement was false or misleading. The CW1 simply confirms what defendants do not dispute (EPIC was a success during the relevant time and even exceeded expectations set in 2015).

Manger focuses on Arthur and Barbour, in part, to argue in his opposition that these two executives were incentivized to have the VTech Tender Offer consummated before either of them could be terminated for their poor performance. Opp. 18-19. However, those allegations are not made the SAC, even if they were somehow relevant to scienter.

Finally, defendants again point to the UK CMA Report – the same report Manger relied upon extensively in his SAC – as negating any inference of scienter because that report concluded that it *was* likely LeapFrog would have hit a liquidity crisis by June or July 2016 and BofA indicated it would not have extended the credit facility past May 2016,[5] all despite the success of EPIC. He attempts to downplay the conclusions of the CMA in opposition, because the CMA made its determinations based on "self-serving" reports from defendants and VTech. Oppo. 19. His selective reliance on and then rejection of the CMA Report is not persuasive.

Manger has not alleged facts supporting a strong inference of scienter.[6]

---

[5] Manger points out that the Recommendation Statement wrongly indicated that the BofA credit facility would expire in March 2017, when it was set to expire in May 2017. Oppo. 19. However, Manger does not allege that sole fact – which defendants admit was a mistake in the Recommendation Statement – as a separate ground for falsity.

[6] I also need not reach the issue of loss causation, which Manger failed to adequately plead in his AC. January 23, 2017 Order at 10. I briefly note that in opposition to the current motion to dismiss, Manger characterizes his current allegations as ones showing that defendants intentionally misled stockholders about LeapFrog's future revenue prospects and liquidity, causing stockholders to agree to the undervalued Tender Offer by a mere 6.6%. Oppo. 21. This chain of events, according to Manger, "led to the rejection of the L&M" proposal. *Id*. Manger, however, does not address the UK CMA Report's conclusions that the L&M offer was unlikely to pan out. Moreover, while the Report concluded that other bidders would have been available absent the merger, it was not the $1.10 L&M offer, it was more likely the "alternate" bidder who offered $0.85 per share for preferred stock only. CMA Report §§ 5.25, 5.56.

## CONCLUSION

Having been given an opportunity to adequately plead the elements of his Section 14(e) claim, and having been unable to do so through three amendments, Manger's Second Amended Complaint is DISMISSED WITH PREJUDICE.

**IT IS SO ORDERED.**

Dated: May 9, 2017

William H. Orrick
United States District Judge